**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

KERSAUNDRA SMITH,

                Plaintiff,

vs.                                    Case No. 3:09-cv-582-J-32TEM

AIRTRAN AIRWAYS, INC.,

                Defendant.

_____

## ORDER

Former flight attendant, Kersaundra Smith,[1] sues her previous employer, AirTran Airways, Inc., claiming that her termination for dishonesty was, in fact, racially motivated or retaliatory and that she was subjected to a hostile work environment.[2]

This case is before the Court on a motion by Defendant, AirTran, for summary judgment. (Doc. 10).  AirTran has filed exhibits in support of the motion and Plaintiff, Smith, has filed a response. (Docs. 11-12, 17).  The Court held a hearing on the motion July 20, 2010, the record of which is incorporated by reference. (Doc. 19).  After that hearing and at

_____

[1]Kersaundra Smith's maiden name is Kersaundra Young.  She was unmarried when some of these events took place but married her fiancé Captain Gregory Smith of AirTran in November of 2007.  This Order shall, like the pleadings and motions, refer to her as Smith but many of the exhibits and documents refer to her as Young.

[2]Through her complaint, Smith implies that she may also have a claim under the Air Carrier Access Act (ACAA) or the Americans with Disabilities Act (ADA). 49 U.S.C. § 41705 (2006); 42 U.S.C. §§ 12101-12213. (2006); (Doc. 1, Pl. Complaint, ¶¶ 23-27).  This Court will consider neither because the ACAA does not support a private cause of action and Smith conceded to the Court that she was not pursuing an ADA claim. Love v. Delta Air Lines, 310 F.3d 1347 passim (11th Cir. 2002).

the request of the Court, AirTran provided a complete copy of the plaintiff's deposition transcript with exhibits. (Doc. 20).

## I.    Facts

Kersaundra Smith is an African American female.  On June 25, 2004, AirTran hired her as a flight attendant. (Doc. 20, Pl. Depo. at 27).  She received positive compliments from both passengers and other crew members on eight occasions ranging from February 22, 2005 to April 16, 2007. (Doc. 20 at Ex. 13-20).  Her good service earned her a position in the L-One Training Session on November 13, 2006. Id. at Ex. 21.  However, there were also problems with her job performance.  On July 13, 2004, while acting as lead flight attendant, Smith encountered a problem with a customer who would not behave and caused such a stir with profanity and refusing to sit in her seat, that the plane was required to return to the gate. Id. at Ex. 10.  The customer complained in writing. Id.  Smith filed two reports on the matter and met with AirTran officials. Id.  A non-disciplinary memo about the incident was entered into Smith's file on August 23, 2005, and the matter was closed. Id.

On February 11, 2006 fellow flight attendant Danielle Reese alleged that Smith had been calling her all night and had finally threatened, "I am going to [expletive] you up when I see you.  You can believe that." Id. (emphasis in original).  The same day, Smith was suspended with pay and required to meet with AirTran officials ten days later on February 21. Id.  Smith admitted calling Reese several times because she believed that Reese was stalking her boyfriend, Gregory Smith. Id.  AirTran ultimately concluded it did not have enough information to determine if Smith had behaved inappropriately but advised her against unprofessional or retaliatory contact with Reese. Id. at Ex. 11.

2

Then, on a trip from April 16-19, 2006, Smith flew with flight attendants Sebastian Davis and Michael Gaitan.  While describing her relationship with Davis, Smith said in deposition, "We're the comedians of AirTran." (Doc. 20, Pl. Depo. at 156).  The other flight attendant, Gaitan, did not find their antics so funny.  He reported them both. (See, Doc. 20 at Ex. 26).  Gaitan wrote up Davis for multiple incidents of air safety violations and rudeness to passengers.  Smith, he wrote up for failure to supervise, condoning, and in some cases, joining in Davis' inappropriate behavior.  AirTran, after meeting with Smith in the presence of her union representative and asking for her side of the story, found these allegations to be true and on May 30, 2006 issued a Termination Warning to her file warning that additional violations of the AirTran Airways Code of Conduct in the next twelve months could result in Smith's termination. Id. at Ex. 25, 27.

Smith filed a grievance with her union, the Association of Flight Attendants (AFA). Id. at Ex. 28-29.  AirTran offered to reduce the Termination Warning to a lesser Written Warning on December 15, 2006. Id. at Ex 30.  Over four months later, however, when AirTran had heard from neither the AFA nor Smith, it withdrew the offer and the Termination Warning remained in effect. Id. at Ex. 31.

On February 19, 2007, a family boarded Smith's plane, to find one of their seats missing a cushion and the others covered in vomit. Id. at Ex. 34.  The plane was booked full. The family complained in writing that Smith yelled at the children and told them they either had to sit in vomit or get off the plane. Id.  The lead flight attendant on that trip, Abraham Torres, reported Smith to AirTran and largely confirmed the family's story saying, "Kersandra[sic] [Smith] was out of line with her statements." (Doc. 11, Parker Aff. at Ex. D.)

3

On March 21, 2007, before AirTran had a chance to respond to the February 19 incident, Smith called in a "fatigue call." (Doc. 20 at Ex. 35). She claimed that while she had been working at Dallas Fort Worth, her hotel had been very noisy. Id. Though she could have changed rooms to avoid the noise, she claimed only smoking rooms were available and those were unacceptable. Id. Thus, though Smith arrived at 9:30p.m. and did not have to leave until 1:00p.m. the next day, she claimed she was not rested and was unfit to fly. Id.

AirTran met with Smith on April 12, 2007 to discuss the February 19 and March 21 incidents. Id. at Ex. 37. As before, she was represented by the AFA. Id. Smith admitted that both incidents occurred, but denied both that she was rude to the passengers and that she was malingering when she made the fatigue call. Id. AirTran concluded that her fatigue call was unjustified. Id. at Ex. 39. It also concluded that the agreement of the family's complaint and Torres' report suggested that Smith was guilty of having made inappropriate and unprofessional comments toward the family. Id. AirTran terminated Smith on May 2, 2007. Id.

Smith filed a grievance through the AFA on May 9 and a complaint for discrimination with the EEOC. Id. at Ex. 40-42, 75. On September 27, 2007 the EEOC dismissed her claim because it was "unable to conclude that the information obtained establishe[d] violations of the statutes." Id. at Ex. 75.[3] On November 15, 2007, AirTran agreed through a "Last

---

[3]Smith contends in her response to AirTran's motion for summary judgment that the EEOC dismissed her claim because she asked them to as a condition demanded by AirTran in exchange for the "Last Chance Agreement." (Doc. 17, Pl. Response in Opposition at 1). She presents no affidavits, documents, or any evidence beyond her bare assertion that this is so and the EEOC documents contradict her assertion. (Doc. 20 at Ex. 75).

Chance Agreement" to rehire Smith with a twenty-four month probationary status. Id. at Ex. 43.

Smith recorded a "no-show" on March 4, 2008 and received another customer complaint on March 10, 2008. Id. at Ex. 12, 44. For the "no-show" she received minor discipline of 4 points on her attendance record. Id. at Ex. 12. For the complaint, AirTran acknowledged in a letter to Smith on May 24 that it would be within its rights to terminate her, but elected to give her another chance. Id. at Ex. 44.

On May 28, 2008, Smith went on an AirTran website that allowed employees to sign-up to travel for free, and scheduled a flight.[4] Id. at Ex. 45. When she booked her flight she listed an accompanying infant, Sophie Smith. Id. Travel for infants was free. However, thanks to a February 2008 policy change at AirTran, travel was no longer free for employee pets; bringing a pet would have cost Smith $414. (Doc. 11, Montgomery Aff., ¶ 7); (Doc. 20 at Ex. 67); (Doc. 20, Pl. Depo. at 272). As Smith neared the gate, she was pushing a covered stroller. (Doc. 20, Pl. Depo. at 268-69). AirTran employee Geoffrey Wilson approached her intending to tag her stroller for storage in the belly of the plane. (Doc. 12, Wilson Aff., ¶ 6). As he drew closer, he saw that the "infant" in the stroller was a fluffy dog. Id., ¶ 7.

---

[4]This free or reduced fee travel was a benefit of employment at AirTran and could be used both by employees and significant others or family members of employees. The benefit was only available to employees in good standing and family members of employees who had not themselves been fired from AirTran. This benefit was automatically cancelled upon each of Smith's terminations though enforcement of the cancellation was imperfect as Smith flew on Gregory Smith's number several times in 2007 prior to being rehired by AirTran. (Doc. 20 at Ex. 39, 51);(Doc. 11, Cannon Aff. at Ex. A).

Wilson told Smith that she would have to pay for her pet. Smith replied that the new policy of charging for pets had been changed, and they were again free. Id., ¶ 9. Wilson allowed her to board but investigated with the Customer Service Supervisor on site, Cherilyn Brooks. Id., ¶ 10. They checked the policy and discovered that it was still in full effect. Id., ¶ 11. Brooks boarded the plane and told Smith that she would have to pay. (Doc. 11, Brooks Aff., ¶ 7). Smith refused and said for the first time that the pet was her Emotional Support Animal(ESA). Id. AirTran makes an exception to the fee in the case of Service Animals, including ESAs, provided that the presence of the animal "is found to be medically necessary for the customer traveling with the animal." (Doc. 20 at Ex. 63).

Smith offered Brooks no documentation to prove the dog was her ESA. (Doc. 11, Brooks Aff., ¶ 7). Neither did she provide such documentation during or after the subsequent AirTran investigation; moreover Smith has not submitted to this Court any documentation to show that the dog was her ESA on the travel date. (Doc. 20, at Ex. 51). She did not fly with the dog when she was working as a flight attendant. (Doc. 20, Pl. Depo. at 251). Furthermore, Smith admitted during deposition that the decision to buy the dog was a self-diagnosis and self-prescription after reading on the internet and that the dog's chief function was to wake her up after she mixed wine with Xanax and Ambien. Id. at 252-54, 262-64, 276-78. Disbelieving Smith's claim that the dog was an ESA, Brooks gave her a choice to deplane or pay. (Doc. 11, Brooks Aff., ¶ 9). Smith left the plane.

On June 6, Smith was summoned to a meeting with AirTran officials. (Doc. 20 at Ex. 47). She was represented by the AFA. Id. She claimed to have been told by an unidentified agent in Atlanta to list the dog as an infant. Id. She said she did not remember discussing

6

policy changes with Wilson. Id.  Though she admitted listing the dog as a "pet" in the past through a telephone booking system, she said she had received a memo, a copy of which is not in the record, telling her not to call the reservation desk to list the pet. Id.; (see also, Doc. 11, Cannon Aff. at Ex. A).  Finally, Smith claimed that she had documentation for the ESA which she did not produce because she was not asked for it. (Doc. 20 at Ex. 47).  As a result of this meeting, AirTran concluded that Smith had been dishonest and terminated her on July 2, 2008. Id. at Ex. 51.

With her termination, AirTran stripped Smith of the right to free travel. Id.  On July 7, 2008, Smith again tried to travel non-revenue using her husband, pilot Gregory Smith's employee number and was not allowed on the plane. Id. at Ex. 82.

## II.    Discussion

SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that establish the absence of any genuine, material factual dispute." Branche v. AirTran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (citing Fed. R. Civ. P. 56(c)).  However, judgment should enter against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Hayes v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

RETALIATION (COUNT I)

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008);see also, e.g., Gupta v. Fla. Bd. Of Regents, 212 F.3d 571, 587 (11th Cir. 2000).

A protected activity under Title VII is, among other things, an employee's participation in an investigation proceeding or hearing under Title VII or opposition to a practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a) (2006). In this case, it is uncontested that Smith filed claims with the AFA and the EEOC following her first termination. (Doc. 20 at Ex. 40-42, 75). Thus, with respect to the EEOC claim, Smith can readily satisfy this element and the Court assumes arguendo, without deciding, that the AFA claim qualifies as "protected activity" under Title VII as well.[5]

_____

[5]Smith filed a union grievance with the AFA, and her complaint also alludes to another proceeding with the Georgia Department of Labor (though Smith has submitted no

AirTran terminated Smith after she had filed her claims. Id. at Ex. 39.  An adverse employment action is "a *serious and material* change in the terms, conditions, or privileges of employment[.]" Crawford, 529 F.3d at 970-72 (emphasis original) (quoting Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001)).  Having been terminated, Smith has no problem demonstrating this element.

Where Smith's claim fails is in her inability to show causation.

> To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.  In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. [...] The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.

Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (internal citations and quotations omitted).   However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action

---

documentation about that proceeding). (Doc. 1, ¶¶ 19-20); (Doc. 20 at Ex. 40-42).  The Eleventh Circuit has recognized that the scope of protected practices extends beyond investigations directly conducted by the EEOC.  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1352-53 (11th Cir. 1999).  Title VII also protects persons who have "opposed any practice made an unlawful employment practice by this title[.]" 42 U.S.C. § 2000e-3(a).  The Northern District of Georgia held that this language includes even conduct in opposition to a discriminatory practice that does not include a filing with any authority. Gresham v. Waffle House, Inc., 586 F. Supp. 1442, 1445-46 (N.D.Ga 1984).  Thus, this Court assumes for purposes of argument, without deciding, that the AFA claim and Department of Labor claim qualify as a protected activity under Title VII.  However, because Smith has not provided any evidence regarding her Department of Labor claim (even as basic as when and on what ground it was filed), this Court concludes that she has failed to present a genuine issue of material fact on that ground for retaliation, and it will not be discussed in the body of the opinion.

as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations and citations omitted).  Thus, a claimant must either show direct evidence of causation (for example a statement by a defendant that plaintiff was fired because of a claim), or rely on circumstantial evidence, for example, where events are very close in following one another.

AirTran suggests that the Court follow Breeden and its Eleventh Circuit progeny and cites Higdon v. Jackson; Wascura v. City of South Miami, and an unpublished case Schechter v. Georgia State University, for the proposition that even three to five months is too long a time lapse between the protected act and an adverse employment consequence to be sufficient evidence of a causal connection. 393 F.3d 1211, 1221 (11th Cir. 2004); 257 F.3d 1238, 1248 (11th Cir. 2001); 341 F.App'x 560, 563 (11th Cir. 2009).  The Eleventh Circuit recently decided in Brown v. Alabama Department of Transportation, that, in the absence of other evidence of retaliation, intervals longer than three months would be insufficient as a matter of law to find retaliation. 597 F.3d 1160, 1182 (11th Cir. 2010) (quoting Breeden, 532 U.S. at 273.)  As explained in Stone v. Geico General Insurance Co., an unpublished decision, Breeden shows that the relevant questions for determining causation are when the decision maker, not merely the larger corporate defendant, found out about the plaintiff's protected activity and how much time then passed before the adverse employment action occurred. 279 F.App'x 821, 823-24 (11th Cir. 2008) (discussing Breeden, 532 U.S. at 273-74).

Smith was not fired immediately following her EEOC filing.  Quite the opposite in fact–she had been fired by AirTran already when she filed and after filing, was rehired. (Doc. 20 at Ex. 39, 43, 75).  Though Smith was then later fired again, there is neither evidence nor allegation that Erika Montgomery, who handled Smith's second firing, ever knew about the long-defunct EEOC claim. (Doc. 11, Sauer-Clark Aff. at ¶¶ 4, 7-9) (showing that Peggy Sauer-Clark handled the "Last Chance Agreement" following the dismissal of the EEOC case); (Doc. 11, Montgomery Aff., ¶¶ 8-13) (showing that Montgomery handled Smith's second termination).  Thus there is no evidence showing that Montgomery knew of that protected act in order to form a retaliatory motive when she made the adverse employment decision.

Even if Montgomery did know about the old AFA filing or that the EEOC case had once been filed, the time between when the EEOC case was dismissed on September 27, 2007 and when Smith was terminated for the second time on July 2, 2008, was over nine months. (Doc. 20 at Ex. 51, 75).  The time between when the AFA grievance was filed on May 9, 2007 and the second termination, was over a year. Id. At Ex. 40.  Based on the precedent cited above from the Supreme Court and the Eleventh Circuit, these intervals are too long as a matter of law to prove causation and Smith does not offer any other proof. Brown, 597 F.3d at 1182.

Though no more is needed to decide Smith's retaliation claim, the Court notes that AirTran had, prior to Smith's EEOC claim and AFA grievance filings, shown interest in terminating her. (See, e.g., Doc. 20 at Ex. 27, 39) (Smith had already been issued a "termination warning" and been terminated before she filed and was then rehired and

11

terminated again).   In <u>Breeden</u>, the school district had been contemplating transferring Shirley Breeden before she filed a complaint.  532 U.S. at 271-72.  A few months after Breeden filed, she was transferred.  The Supreme Court said, "[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." <u>Id.</u> at 272.  Similarly, it makes little sense to consider Smith's EEOC or grievance claims to be the basis for her subsequent firing because she had already been fired once for misconduct, and her "Last Chance Agreement" both in name and content makes clear that AirTran contemplated the possibility of firing her again at the least slip-up. (Doc. 20 at Ex. 43).  Moreover, if AirTran really had formed a retaliatory motive when Smith filed with the EEOC and AFA, it could have simply not rehired her.

Lacking an essential element, Smith therefore fails to establish even a *prima facie* case of retaliation.  Thus AirTran need not articulate any reason for having fired her. However, even if Smith were to establish a *prima facie* case, the account of her misconduct that AirTran has placed in the summary judgment record would be sufficient evidence of a non-discriminatory motive for termination. <u>See, e.g.</u>, <u>Id.</u> at Ex. 10, 11, 12, 25-27, 34-35,  37, 39, 44, 47, 51; (Doc. 11, Parker Aff. at Ex. D).  Smith would then have to show that AirTran's articulated reason was "actually a pretext for prohibited retaliatory conduct." <u>Sullivan v. Nat'l R.R. Passenger Corp.</u>, 170 F.3d 1056, 1059 (11th Cir. 1999). Such a showing would require a demonstration of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>McCann v. Tillman</u>, 526 F.3d 1370, 1375-76 (11th Cir. 2008) (quoting <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 725 (11th Cir.

2004)).  Smith, who said in deposition that she believes that AirTran fired her for misconduct and has failed to introduce a shred of evidence beyond accusation, cannot hope to show that AirTran's reason was pretextual. (Doc. 20, Pl. Depo. at 370).

RACE DISCRIMINATION - "HOSTILE WORK ENVIRONMENT" (COUNT II)

Title VII's broad reach of protection against discrimination includes protecting persons from having to work in a hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-21 (1993).  Many published cases on hostile work environment claims in the Eleventh Circuit involve sexual rather than racial claims. See, e.g., Beckford v. Dep't of Corr., 605 F.3d 951 (11th Cir. 2010); Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798 (11th Cir. 2010).  However, Miller v. Kenworth, confirms that this same analysis applies in race discrimination cases and its facts are instructive for considering the case at bar. 277 F.3d 1269 (11th Cir. 2002).  In Miller, the plaintiff was subjected to numerous and severely offensive racial epithets, which were yelled at him in anger, whilst berating his job performance, several times per day, every day, for a month. 277 F.3d at 1273, 1276-77, 1279.  By abrupt contrast, Smith has not pointed to one instance of racially (or gender) motivated treatment, ridicule, innuendo, or statement and in fact, cannot do so, because she has confirmed that nothing of that sort ever took place.  (Doc. 20, Pl. Depo. at 405-06). Though Smith belongs to a number of protected groups, she has not pointed to a single incident of harassment, to say nothing of harassment that is so severe or pervasive such that it "create[s] an objectively hostile or abusive work environment[.]" Harris, 510 U.S. at 20-21; (see also, Doc. 20, Pl. Depo. at 405-06) (Smith stating that she never heard a single remark that was either racist or derogatory toward her disability for which she needed the ESA).

13

Smith therefore fails as a matter of law to make even the *prima facie* showing of racial (or any other form of) discrimination based on a hostile work environment.

RACE DISCRIMINATION - GENERALLY (COUNT II)

Smith also alleges that she was treated adversely in comparison to other similarly situated individuals based on her race. "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."[6] Crawford, 529 F.3d at 970.

Smith is a member of a protected class. The first element is therefore satisfied. Because AirTran terminated Smith, she suffered an adverse employment action. (Doc. 20 at Ex. 39); See e.g., Crawford, 529 F.3d at 970-72; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Thus, Smith easily meets the first and third elements and this Court declines to examine the second since it is unnecessary to do so and neither party has much focused on it.

It is on the fourth element that Smith, who must show that the employer treated her less favorably than a similarly situated individual of another group, cannot prevail. "The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all

---

[6]Each case that articulates this four-part test for a *prima facie* case tailors the test to the facts of their case. See, also e.g., Brown, 597 F.3d at 1174; Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1322-23 (11th Cir. 2006); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004); Equal Emp't Opportunity Comm'n v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).

14

relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." <u>Wilson</u>, 376 F.3d at 1091 (quoting <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997); citing <u>Silvera v. Orange County Sch. Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001)). In her deposition, Smith alluded to several possible comparators. However, with a few exceptions that will be detailed below, allusion is all Smith provides.

Smith complained of excessive uniform checks and drug tests. (Doc. 20, Pl. Depo. at 50-52, 56-58). However, she was indefinite as to how many times each occurred and she could not identify any other flight attendant or AirTran employee with whom she could be compared to assess the rates at which these events occurred. <u>Id.</u>

Smith claimed to have only gotten one complaint in four years, for which she was terminated immediately, in contrast to others who had many complaints. <u>Id.</u> at 80. Of course, even ignoring the incidents leading up to her second firing, this is untrue since a passenger complained about her flight with Smith and her subordinates on July 13, 2004, a coworker complained of harassment on February 11, 2006, and another coworker complained of Smith's behavior on a trip from April 16-19, 2006, all before the complaints for which she was fired for the first time in 2007 occurred. (Doc. 20, at Ex. 10, 11, 25-27). Nonetheless, Smith insisted there were other white flight attendants who had received a couple of complaints a month without consequence. (Doc. 20, Pl. Depo. at 80-81). Smith could not name any but thought she had overheard an older white woman named "Greta" or "Gretchen," who was still a flight attendant, laughing about having received lots of customer complaints. <u>Id.</u> at 80-81, 136-37.

Smith also insisted that there were African American flight attendants who were usually suspended after complaints.  She thought one might have been named "Devon" or "Dejon." Id. at 82-83.  "Devon" or "Dejon" might have worn glasses and might have gotten some unknown type and number of complaints.  Id. at 82-83.  She mentioned another male African American flight attendant who was, she remembered, suspended on two occasions and removed from the lead program. Id. at 211-12.  But she did not know what the complaints against him were nor did she submit any evidence about his circumstances. Id. at 212.  Smith did list four African American female lead flight attendants by first and last name. Id. at 209-11.  But none of them had ever, to her knowledge, gotten in trouble or been given termination warnings. Id.

In fact, the only individual comparators Smith now puts forward to oppose summary judgment are Michael Gaitan and Abraham Torres. (Doc. 17 at 2).  However, Gaitan and Torres are not similarly situated to Smith in all relevant respects.  Both are, according to Smith, white males. (Doc. 20, Pl. Depo. at 155, 209).  Gaitan was Smith's subordinate while Torres was Smith's superior. Id. at 155, 202.  However, more salient than these differences is this–Gaitan and Torres both reported Smith's poor behavior to AirTran but were not themselves implicated in any wrongdoing. (Doc. 20 at Ex. 26-27, 39); (Doc. 11, Parker Aff. at Ex. C-D).  In short, neither Torres nor Gaitan are good comparators for Smith.

Smith tries to suggest an additional comparison between the couple "Bernice and Rick," and Smith and her husband. (Doc. 20, Pl. Depo. at 319-21).  Smith suggests that she and her husband, who are an interracial couple, were treated differently from Bernice and Rick, who are both white. Id.  Smith claims that she was denied the right to travel on her

16

husband's non-revenue benefits after being terminated (which is AirTran policy) and that Bernice had been allowed to travel on her boyfriend's benefits even though she had been terminated. Id.   However, Smith has not provided any information beyond her mere accusation that this is so or that these couples are similarly situated.  Furthermore, Smith attempted to fly non-revenue and was denied travel privileges on July 7, 2008 after being fired on July 2, 2008. (Doc. 20 at Ex. 51, 82).  Smith was thus not an employee when she was denied travel privileges and therefore could not possibly show an adverse *employment* action by AirTran arising from this circumstance.

Even if Smith were able to produce a compelling comparator, she would still need to overcome AirTran's stated reason for firing her.  That is, to succeed at trial in the face of a defendant who advances a nondiscriminatory motive for the adverse employment action, a plaintiff must prove not only the *prima facie* case and the falsity of defendant's proffered motive, but that defendant's true motive was discriminatory. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513-16 (1993).   AirTran has presented significant evidence of a non-discriminatory motive for firing Smith while Smith has failed to produce any evidence of pretext or discrimination.  Even with every inference drawn for Smith, the Court cannot do other than conclude as a matter of law that she has presented neither a *prima facie* case nor shown any hope of prevailing even if she could present a *prima facie* case.

Accordingly, it is hereby

**ORDERED**:

1.  Defendant's Motion for Summary Judgment (Doc. 10) is **GRANTED** on all claims and counts of the complaint (Doc. 1).

2.  The Clerk shall enter judgment in favor of AirTran Airways, Inc. and against Kersaundra Smith and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 12th day of October, 2010.

_____
TIMOTHY J. CORRIGAN
United States District Judge

bt.
Copies:
Counsel of Record

18